**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:22-cr-106 (CJN)** |
| **SHAWN PRICE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Shawn Price to 18 months of incarceration, which is the top of the applicable Sentencing Guidelines range, along with three years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment.

## I.     INTRODUCTION

The defendant, Shawn Price, is a regional leader of the Proud Boys who not only violently attacked law enforcement officers during the January 6, 2021 siege of the United States Capitol, but also organized, encouraged, and directed others to do so. Thanks to the efforts of the defendant and hundreds, if not thousands, of rioters like him, the January 6 attack forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United

On January 6, 2021, Price—a car technician and tow truck driver who was Vice President of his local New Jersey chapter of the Proud Boys at the time[2]—led a group of 4-5 New Jersey Proud Boys to the Lower West Terrace of the Capitol grounds, a restricted area. Despite observing police officers attempting to control and disperse the crowd, and despite being hit in the chest with a rubber bullet and sprayed with tear gas by those same officers, Price was not deterred. Instead, he and his group of Proud Boys pushed through the crowd of rioters to get to the front line of the mob's conflict with the police.

There, Price and his fellow New Jersey Proud Boys forcibly interfered with the officers twice in a five minute span. First, Price directed his fellow New Jersey Proud Boys to join him and other rioters as they pushed against the police line in an attempt to break it. Second, Price and his fellow New Jersey Proud Boys impeded the officers' efforts to arrest another rioter.

Later that afternoon and evening, Price posted messages on Facebook in which he bragged about his violent conduct against the officers and took credit for breaking through the police line and escalating the riot. For example, at 4:12 p.m. EST, Price messaged another Facebook user at: "We did it bro we took it the fuck ober . . .Over . . . We are inside the capitol now."[3] At 6:11 p.m., Price bragged to another Facebook user: "We took it buddy . . . Me and 3 others stormed it and no one else would until.we started then everyome stormed." Nevertheless, in his post-arrest interview, Price minimized his conduct, denied pushing into the police line, and claimed that he was only

_____

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] Sometime after January 6, 2021, the New Jersey Proud Boys split into two separate chapters. Price is currently President of one of them.

[3] The evidence gathered by the government does not support Price's claim that he entered the U.S. Capitol building itself.

trying to help a fallen older protestor, a claim surveillance and body camera video does not support.

The government recommends that the Court sentence Price to 18 months' incarceration, which is the top of the advisory Sentencing Guidelines' range of 12-18 months, for his conviction of violating 18 U.S.C. § 231(a)(3). An 18-month sentence reflects the gravity of Price's conduct on January 6, 2021, his attempts to minimize or avoid responsibility for his conduct, and his repeated violations of his conditions of pre-trial release.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 38, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Shawn Price's Role in the January 6, 2021 Attack on the Capitol

#### *Price's Violent Lead Up to January 6, 2021*

The roots of Shawn Price's unlawful, violent conduct on January 6, 2021, began months earlier. Price, a New Jersey resident employed as a tire technician at Quality Discount Tire, joined the Proud Boys[4] and rose to the position of Vice President of the New Jersey state chapter. Price's

---

[4] The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos to public events. *See* "Proud Boys Backgrounder," available at: https://www.adl.org/resources/backgrounder/proud-boys-0 (last accessed February 2, 2023).
    Separate investigations by the FBI and Congress have revealed that members of the Proud Boys, working in concert, instigated and led some of the key escalations during the riot at the U.S.

Facebook posts reveal that in the wake of the 2020 presidential election, Price—joined by a cohort of New Jersey Proud Boys—attended multiple rallies in support of the "Stop the Steal" movement, including rallies in Washington, D.C. on November 14, 2020, and December 12-13, 2020.



*Image 1: Price (indicated by the red arrow) and a group of New Jersey Proud Boys in Washington, D.C. on November 14, 2020. The group is wearing the Proud Boys' signature colors: black and yellow.*

Price's Facebook posts indicate that during the latter trip to Washington, D.C., Price and his Proud Boys associates engaged in multiple violent nighttime fights, documented by photographs and videos Price shared with other Facebook users.[5] In one such video, Price can be seen punching another individual in the head. Price was proud of his violence. In association with that video, Price posted "I tagged a guy good at 14 seconds i had the stripe sweater and black hat" and "me at 14 seconds in with stripe sweater and black hat…all those sticks and flags my guys

---

Capitol on January 6, 2021, including the first breach of the building itself. *See, e.g.*, *United States v. Nordean, et al.*, 1:21-cr-175 (TJK) (currently in trial).

[5] The government obtained Price's relevant Facebook posts, including these videos, via a federal search warrant.

were hitting them with they ripped out of their hands."



*Image 2: The top image is a screenshot of the aforementioned video that shows Price (left) punching an unidentified man with an orange hat. The bottom image shows Price (wearing a black stocking hat with a New Jersey Devils logo and a black sweater with double white stripes) as he appeared that night with his Proud Boys associates.*

On January 5, 2021, Price and ten to twelve other New Jersey Proud Boys drove in a caravan from New Jersey to Washington, D.C. to attend the "Stop the Steal" rally planned for January 6, 2021. Anticipating violence, Price brought ski goggles to protect his eyes from chemical irritants and dried milk to treat them in case he got sprayed.

### Price's Approach to the Capitol on January 6, 2021

On January 6, 2021, Price attended the "Stop the Steal" rally on the Ellipse as planned and then—along with four to five of his New Jersey Proud Boys associates—walked to the U.S. Capitol

5

building and forcibly participated in the attack on the Capitol on the West Front. Price's crimes are documented through a series of videos filmed by Price himself, many of which Price uploaded to Facebook, as well as by body worn cameras from the MPD, open-source videos and photographs, and USCP surveillance footage from the Capitol grounds. Price filmed one of his videos "selfie-style"—meaning with the camera facing him—and it captured his appearance and clothing that day:



*Image 3: a screenshot from Price's selfie-style video capturing his appearance, headgear, and outerwear on January 6, 2021*

When Price arrived on the West Front, specifically the Lower West Plaza, he observed police officers attempting to block, contain, and disperse the mob. Rather than accept the officers' authority and leave the restricted area, Price began filming with his cell phone. He recorded video of police officers deploying chemical irritants and impact ordinance into the crowd and in his direction:



*Image 4: Screenshots from Price's footage of police attempts to control and disperse the crowd on the West Front.*

The police action, making clear that his presence inside the closed area of the Capitol Grounds was unwelcome and unlawful, did not deter Price. Instead, it angered him and fortified his resolve to fight the police. While filming the police deployment of chemical irritants and impact ordinance, Price yelled, "Look at what these fucking scumbags are doing!   Look at that shit! Look at that shit!" and "Fuck you assholes!   It's go time guys!   Fuck you!   Fucking shoot at us! Fuck you!" and "You fucking coward, fuck you . . . fuck you!   They're dead, they're dead!" Price posted the video he recorded, and similar videos taken by other rioters, on Facebook.

### *Price Pushes to Break the Police Line*

Rather than retreat, or even leave the Capitol grounds, Price and his cohort of New Jersey Proud Boys pushed to position themselves within three rows of the front line of the mob's conflict with the police attempting to secure the Capitol.



*Image 5: Price (indicated by the yellow arrow) and his cohort of New Jersey Proud Boys (indicated by the yellow box) after they have maneuvered to a position near the front line of the conflict with police on the Lower West Plaza.*

There, with officers standing behind bicycle rack fencing and blocking off access to the Capitol building, video captures Price making the following statements, clearly establishing his animosity toward the police, who were simply trying to do their jobs, and his intent to overrun them:

- "Let's go . . . let's go . . . let's go!"

- "They thought we couldn't do it, they wanted to hold us back, now look at this shit! More tear gas, going in the building.   They're going anyway, they're going.   USA . . . USA . . .USA . . ."

- "Fuck that tear gas . . . we took this shit over baby!"

- "I didn't get this far . . . (inaudible) . . . let's go!   Traitors, traitors . . . ."

- "Trying to whack us with, ah, pepper balls and tear gas . . . Capitol's being stormed . . . they're about to shoot."

USCP surveillance footage shows Price using hand gestures to direct the movements of his fellow New Jersey Proud Boys.



*Image 6: Price using hand gestures to direct others.*

Less than 30 seconds later, Price and his crew of New Jersey Proud Boys surged forward and pushed on the backs of the rioters in front of them, using their collective force to smash into the police line in an apparent attempt to break through it:



*Image 7: Price (indicated by the yellow arrow) and his cohort of New Jersey Proud Boys (indicated by the yellow box) pushing into the backs of the rioters in front of them, collectively pushing against the line of police officers, whose stances indicate they are pushing back.*

9



*Image 8: A zoomed-in version of Image 7. Price is indicated by the yellow arrow.*

A comparison of Images 5 and 7 makes clear that Price and his fellow Proud Boys moved forward to forcibly oppose the officers. Although it does not appear that Price made direct physical contact with officers himself, he forcibly helped to push the mob forward into the police line.

In response to the mob's push against the police line, an officer sprayed Price and his companions with oleoresin capsicum ("O.C.") spray, commonly referred to as pepper spray.

10



*Image 9: Price (indicated by the yellow arrow) being sprayed with O.C. spray in response to his push against the police line.*

In Facebook messages Price sent later that afternoon and evening, he bragged about his attempt to forcibly break through the police line:

- 4:12 p.m.: "We did it bro we took it the fuck ober . . .Over . . . We are inside the capitol now."[6]

- 6:11 p.m.: "We took it buddy . . . Me and 3 others stormed it and no one else would until.we started then everyome stormed."

- 7:13 p.m.: ". . . i got really fucked up but me and 4 of my chapter brothers pushed that line and started it ourselves had to be done."

Similarly, Price recorded a selfie-style video with an associate in which they discussed their role in breaching the police line on the West Front. Their dialogue includes the following lines:

PRICE: Its way bigger than that, honey.

ASSOCIATE: Just, just so we know.

---

[6] Other than Price's statements, the United States does not possess any other evidence that Price entered the Capitol building.

11

PRICE: It's all good.

ASSOCIATE: Just so we know . . . today we stormed the mother fucking capitol of our country . . . took some shots . . . my boy over here . . . we fucking handled it . . . first motherfuckers (inaudible) that's how we do.

PRICE: Don't worry about it.   It's gonna be all right.   Trump isn't going anywhere honey . . . don't worry.   Yeah . . . fuck yeah . . . that's how we do it baby (inaudible) . . . mother fucking cop . . . wolfpack.

### *Forcible Interference with an Arrest*

Approximately six minutes later, in the same location on the West Front, video footage and professional photographers captured Price forcibly interfering with police officers' efforts to arrest another rioter. Specifically, as shown in Image 10, the police were attempting to detain or arrest a man with dreadlocks wearing a red hat. Price reached in, grabbed the dreadlocked man in the red hat, and tried to pull him away from the officers.



*Image 10: Price (indicated by the yellow arrow) with his arm outstretched, attempting to pull the man in the red hat (indicated by the white arrow) away from the police.*

In response, a police officer successfully repelled Price and his crew by spraying them with O.C.

spray for a second time.



*Image 11: Price (indicated by the red arrow) with his arm outstretched, attempting to pull the man in the red hat (indicated by the white arrow) away from the police as an officer begins spraying*



*Image 12: Price (indicated by the red arrow) retreating from the full blast of O.C. spray aimed directly at him.*

13

***Price's Other Communications on January 6, 2021***

Price engaged in further Facebook messaging on January 6, 2021 that reveals his conduct, intent, and state of mind. For example, at 2:57 p.m., Price participated in the following Facebook-based text message conversation with his mother:

PRICE'S MOTHER:   You ok. I just say they stormed the capital

PRICE:                     I led the storm!

PRICE'S MOTHER:   Did you get inside? I saw some did

PRICE'S MOTHER:   I also read they will arrest anyone on the street after 6pm

PRICE'S MOTHER:   National guards on the way

PRICE:                     They are already here and yes i did after getting tear gassed pepper sprayed and shot with rubber bullets.

Over the course of the afternoon, Price and his mother continued exchanging messages. As his mother urged him to leave the Capitol complex, Price acknowledged having been pepper sprayed and expressed his belief that reinforcements were on the way: "I know there is a militia of 3000 men on the way in to take over the captiol its going to get crazy were gathering everyone now." Price and his mother's conversation ended at 5:59 p.m. After everything he had seen and done, Price's goal remained the occupation of the U.S. Capitol building and the overthrow of the government.

***Price's Post-Arrest Interview***

On June 8, 2021, FBI agents arrested Price on a criminal complaint and associated arrest warrant related to his conduct at the U.S. Capitol on January 6, 2021. Price voluntarily agreed to a custodial interview without an attorney present.

In summary, Price identified himself in the above-referenced photographs and videos and

14

admitted to protesting on Capitol Grounds but he minimized and attempted to justify his conduct. Price claimed that when he arrived in Washington, D.C. in the early morning hours on January 6, 2021, he had no intention of engaging in violent activity, let alone storming the Capitol or otherwise inciting violence. He said he walked to the Capitol after former President Trump's rally speech at Trump's urging. Price asserted that when he arrived on the West Front, he saw that the barricades were all knocked down and the area was full of people. Many of them were chanting, but no one was attacking police officers. Price maintained that the police indiscriminately fired flash bangs, rubber bullets, and pepper balls into the crowd, including toward Price and his fellow New Jersey Proud Boys, without provocation and that one of the rubber bullets hit him in the chest.

Price denied engaging in any obstructive or aggressive conduct toward the police, particularly pushing against their line, or otherwise attempting to enter the Capitol building. Price contended that the videos showing him saying things like "Let's go!" to his fellow Proud Boys were calls for them to exit the area, not attempts at rallying, inciting, or directing them to surge against the police.

The agents showed Price Images 7-9. Price claimed that he was not pushing against the police line in those photographs but rather trying to help a man who had fallen to the ground. Price said he tried to grab the man to assist him, but the police moved toward the man and grabbed him before Price could so Price let the man go. He said he saw the police officers pull the man behind their line, so Price believed they arrested the man.

The United States is unaware of any evidence that supports Price's claim about the man whom he says fell to the ground and that he claims to have tried to help.

The agents also showed Price Images 10-12. Price asserted that he was not attempting to

interfere with the arrest of the dreadlocked man in the red hat but rather that he was trying to assist an older man who had turned purple and collapsed to the ground after being sprayed by the police. According to Price, EMS arrived and tended to the older man and he later heard that the older man had died subsequently from his injuries.

Again, the United States is unaware of any evidence that supports Price's claim about the older man.

The agents informed Price that they had acquired judicially authorized warrants to search his person, residence, and mobile telephone. Price voluntarily provided the password to unlock his cell phone.

### Price's Repeated Failures to Comply with the Terms of His Pre-Trial Release

The PSR details Price's numerous violations of the conditions of his pre-trial release, including the conditions that he not ingest controlled substances, such as marijuana, opiates, and fentanyl; submit to periodic drug testing; refrain from committing new crimes or offenses; and abide by a curfew. *See* PSR ¶¶ 12-22. Indeed, the PSR details Price's multiple failed drug tests, his failures to comply with treatment programs, his new drug arrest, his numerous traffic offenses, and his lies to his supervising Pre-Trial Services officer. *See id.*.

### III.   THE CHARGES AND PLEA AGREEMENT

On March 30, 2022, a federal grand jury returned an indictment charging Price with three counts, including a violation of 18 U.S.C. § 231(a)(3)(civil disorder). On October 14, 2022, Price was convicted of the § 231(a)(3) violation based on a guilty plea entered pursuant to a plea agreement. *See* ECF 37. The government agreed to dismiss the remaining charges. *See id.*

IV.     STATUTORY PENALTIES

Price now faces sentencing on the violation of 18 U.S.C. § 231(a)(3)(civil disorder). As noted by the plea agreement and the PSR issued by the U.S. Probation Office, he faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Here, the United States agrees with the calculation determined by the U.S. Probation Officer ("Probation"), as memorialized in the Presentence Investigation Report ("PSR"). Probation determined that Price's total adjusted offense level, after acceptance of responsibility, is 11, PSR ¶ 51, and his criminal history produces a criminal history category of III, PSR ¶ 57. Accordingly, Price's Guidelines custody range is 12 to 18 months' imprisonment. PSR ¶ 129. Price's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained in the PSR. ECF 37 at 2-3.

VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration at the top of the advisory Guidelines range.

A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Price's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis. The nature and circumstances of Price's offense were of the utmost seriousness, and fully support the government's recommended sentence of 18 months of imprisonment.

As noted in the PSR, *see* PSR ¶ 35, the group of officers that Price and his crew of New Jersey Proud Boys pushed against on the Lower West Plaza were within ten yards of a smaller, isolated line of officers who were guarding the northern stairs of the West Terrace. Due to the unruliness of the crowd that included Price, the first group of officers had to maintain their position and could not go assist the second, smaller group. Soon thereafter, rioters overran that small group of police officers and gained access to those northern stairs, which led the rioters to the Upper West Terrace, where there were few officers stationed. This gave the rioters access to the Capitol building itself and just a few minutes later, rioters smashed in the windows on either side of the Senate Wing Door, climbed through them, and invaded the Capitol building, causing Congress to suspend the Joint Session and the Secret Service to evacuate the Vice President. In this way, Price's actions had a direct impact on the obstruction of Congress and the other most serious aspects of January 6.

Moreover, Price's agreed-upon Sentencing Guidelines do not contain a role enhancement. Accordingly, it is appropriate for the Court to consider Price's leadership role separately in determining the appropriate sentence to impose. Indeed, Price's efforts to organize and direct his crew of New Jersey Proud Boys against the police supports sentencing him to the high end of the Sentencing Guidelines range rather than the low-end or even middle.

18

### B.  The History and Characteristics of the Defendant

In addition to his conduct on January 6, Price's criminal history and behavior while on pre-trial release demonstrate a consistent and troubling refusal or inability to live a law-abiding life.

This is far from Price's first experience with the criminal justice system. He has a significant history of arrest and conviction that weighs in favor of a substantial period of incarceration:

- In 2002, when he was 18 years old, Price was convicted of Criminal Trespass and Possession of Less than 50 Grams of Marijuana after being caught starting a campfire on school property and having a bag of marijuana in his pocket. PSR ¶ 53. The court sentenced him to 30 days of community service and suspended his driver's license for six months.

- In 2014, at age 19, Price was convicted of Simple Assault after a witness reported that Price hit a victim with a wooden axe handle during a domestic disturbance. Police found the victim cut, bloodied, and bruised. Price was credited for two days in jail and sentenced to two years' probation. PSR ¶ 54.

- In 2014, again at age 19, Price was convicted of Threatening Violence in connection with a drug-related robbery, apparently by one of his associates. Price was credited for 33 days in jail and sentenced to two years' probation. PSR ¶ 55.

- In 2019, at age 25, Price was convicted of Wandering/Prowling to Obtain or Sell Controlled Dangerous Substances after he failed to use a proper turn signal and the ensuing traffic stop led police to discover "a small amount of raw marijuana and a pipe." Price was given a suspended sentence of 90 days of jail and a $300 fine. PSR ¶ 56.

Price's criminal conduct on January 6 was not an isolated event in an otherwise law-abiding life. It occurred, instead, after a series of offenses. And his criminal activity continued even after being arrested in this case, even after this Court extended leniency by allowing him to remain out on bond, and even after this Court granted him second and third chances to abide by the conditions it set for his release. Price's criminal history demonstrates a propensity towards law breaking that elevates the risk he will reoffend, as does his continued involvement with the Proud Boys, one of

19

the groups that was responsible for the violence, property damage, and potential Constitutional crises that occurred on January 6, 2021, and whose national leaders celebrate their destructive role on January 6. The defendant's history and characteristics, including his history of both acting violently and threatening violence, weigh heavily in favor of a term of incarceration at the high end of the applicable Sentencing Guidelines.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Price's criminal conduct, which includes forcibly trying to break the police line and prevent the officers from arresting another rioter on January 6, as well as repeatedly flouting the Court's conditions of release by using drugs and committing new drug crimes and traffic offenses, was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration.

First, Price's criminal history shows a clear pattern of unlawful behavior that even federal arrest and prosecution did not halt. *See* Section VI(B) *supra.*

Second, Price has still not been fully truthful with law enforcement officials about his own conduct. Indeed, during his FBI interview, he repeatedly sought to minimize or excuse his criminal conduct, attempting to portray himself as a Good Samaritan merely trying to help two different fallen, distressed fellow protestors rather than a rioter acting to forcibly impede law enforcement. Price's resistance to acknowledging the full scope of his conduct demonstrates a need for specific deterrence. If he persists in believing that he acted heroically on January 6, it would increase the risk that he would offend again.

Third, although Price has now accepted responsibility by pleading guilty and expressed a modicum of contrition, any suggestion of remorse rings hollow. Price demonstrated no real recognition of wrongdoing until he pleaded guilty. Indeed, in Price's public Facebook posts and private messages to his friends and family on January 6, 2021 and the days that followed, Price unequivocally expressed pride in having been on the vanguard of rioters, of leading the charge against the police, of breaking the proverbial dam that allowed the rioters to ascend the northern stairs and thus occupy the Capitol. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Fourth, Price continues to lead his local Proud Boys chapter, which creates an increased risk that he will engage in violence during protests in the future.

Finally, his continued refusal to follow the directives of this Court, his Pre-Trial Services supervising officer, and even the caregivers at his treatment facilities indicate that his sentence must be sufficient to provide specific deterrence from committing future crimes, particularly crimes of violence, in light of his history of recidivism and violent conduct.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case because they each involve a defendant convicted solely of one count of 18 U.S.C. § 231(a)(3).

In *United States v. Nolan Cooke*, 1:22-cr-52 (RCL), the defendant, like Price, pleaded guilty to violating 18 U.S.C. § 231(a)(3). Cooke was one of the first to breach the bike rack barriers on the east side of the Capitol; he physically pushed past officers; encouraged others to force their way into the building; and used his flagpole to strike at a window of the Capitol. Like Price, Cooke engaged in physical contact with police officers, although Cooke directly contacted officers and Price indirectly contacted them. Because he scored out to a criminal history category I (as opposed

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

to Price's criminal history category III) Cooke faced a sentencing guideline range of 8 to 14 months' imprisonment. Judge Lamberth sentenced him to 12 months and a day of incarceration, followed by 36 months' supervised release.

In *United States v. Roger Kent Baugh*, 1:22-cr-313 (JEB), the defendant also pleaded guilty to violating 18 U.S.C. § 231(a)(3). Cooke was one of the first rioters to enter the tunnel and there engaged in multiple coordinated heave-ho efforts with other rioters attempting to dislodge and break through the police line. While Baugh did not carry a weapon on Capitol Grounds, he was aware that his friend and fellow rioter had a firearm and had stolen a police baton during the riot. Baugh also lied about these facts when interviewed by the FBI after his friend's arrest. Like Cooke (and unlike Price), Baugh scored out to a criminal history category I and thus faced a sentencing guideline range of 8 to 14 months' imprisonment. Judge Boasberg sentenced him to 12 months and a day of incarceration, followed by 36 months' supervised release

In *United States v. Moises Romero*, 1:21-cr-677 (TSC), the defendant entered the Capitol building once through the Senate Wing Door and a second time on the east side of the building. He also grabbed the corner of a police officer's riot shield. Like Cooke, Romero scored as a criminal history category I and thus faced a guideline range of 8 to 14 months' imprisonment on the lone 18 U.S.C. § 231(a)(3) charge to which he pleaded guilty. Judge Chutkan sentenced Romero to 12 months and a day of incarceration, followed by 12 months of supervised release.

Judges Lamberth, Boasberg, and Chutkan sentenced Cooke, Baugh, and Romero, respectively, to sentences at 86% of the Sentencing Guidelines range. Price deserves a comparatively longer and stiffer sentence because neither Cooke, nor Baugh, nor Romero organized and/or directed other rioters, have an extensive criminal history that includes violence,

repeatedly violated the Court's release conditions, or committed new crimes while out on pre-trial release. Moreover, neither Cooke nor Romero contacted the officers multiple times. By comparison, Price's conduct on January 6 and afterward was more serious and culpable than theirs, his risk of recidivism is substantially higher, and his need for specific deterrence is greater.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[9] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The police victims in this case did not suffer bodily injury as a result of Price's conduct. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Price must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Price played in the riot on January 6.[10]   Plea Agreement at ¶ 12; PSR ¶ 133.

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol as of April 5, 2022. *Id.* Price's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶¶ 153-154.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 18 months of incarceration; three years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:        */s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## <u>CERTIFICATE OF SERVICE</u>

On February 3, 2023, a copy of the foregoing was served upon all parties listed on the

Electronic Case Filing (ECF) System.

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov